ELDER, Judge.
Lee County School Board and Virginia Municipal Group Self-Insurance Association (hereinafter collectively “employer”) appeal from a decision of the Workers’ Compensation Commission awarding benefits to employee Kitty Sue Miller (claimant) under the Workers’ Compensation Act. On appeal, employer contends claimant failed to prove by clear and convincing evidence that her carpal tunnel syndrome (CTS) was a compensable disease under Code § 65.2-401 because the *256 medical evidence failed to provide a sufficient causal link between claimant’s CTS and her employment. We hold that the evidence as a whole, including claimant’s testimony, supported the commission’s finding of causation. Thus, we affirm the award.
I.
BACKGROUND
Claimant began working for employer at Keokee Elementary school as a substitute employee in 1980 and became a regular employee in about 1990. Most of that time, claimant worked as a cook, but for about two years in the mid 1990s, she worked as a janitor. Claimant’s janitorial work required her to shovel more than a ton of coal into the school’s furnaces on a daily basis. She also “worked on the furnace, took ashes out,” mowed grass, used a “weed eate[r],” and installed windows. In about 1996, she returned to working as a cook, and she worked as a cook throughout the remainder of her employment. Claimant described her work as a cook as follows: “[W]e cook hamburger meat which is 40 to 50 pounds in a case. We stock. We put all of our stock away. We put all of our produce away. We’re constantly lifting pans, kettles, washing, mopping, we lift tables.” She agreed her job involved “repetitive lifting, rotating, bending and use of [her] wrist.”
About three years prior to the December 2000 hearing, claimant began to experience problems with her arms and wrists. She “thought it was just [the] lifting” causing her “wrists [to] get sore,” and she “never thought [anything] about it” “because [she] enjoyed working.” However, when her “hands kept getting worse” and began “going numb and drawing up on her,” she decided to seek medical attention. At that time, she was engaged in no hobbies or any other activities outside of work.
On October 8, 1999, claimant saw Dr. Richard Norton with complaints of pain in her upper extremities. She reported the pain was in her shoulders, elbows and wrists and that it was *257 worse in the mornings. After x-rays of claimant’s hands revealed no arthritic changes, Dr. Norton referred claimant to Dr. Mohammed Bhatti, a neurologist. When Dr. Bhatti examined claimant on November 1, 1999, he detected a loss of grip strength in claimant’s hands and noted the loss was greater in her dominant left hand. Dr. Bhatti suspected carpal tunnel syndrome (CTS). Nerve conduction studies performed on December 3,1999, confirmed “bilateral median nerve compression in carpal tunnel, left more than right.” Claimant’s nerve conduction studies also indicated right ulnar nerve compression in the cubital canal. Dr. Bhatti noted claimant had subcutaneous knots on both arms, but he gave no indication of any connection between the nodules and claimant’s CTS.
On referral from Dr. Bhatti, claimant then saw Dr. Hossein Faiz, a surgeon, regarding removal of the painful subcutaneous nodules on her elbows. On December 15, 1999, Dr. Faiz removed the nodules. He noted that the right nodule had attached and compressed the right ulnar nerve whereas the left nodule “was not close to any major nerve structures.” Dr. Faiz directed that a copy of his operative note be sent to Dr. Bhatti.
Dr. Bhatti saw claimant again on December 22, 1999, after Dr. Faiz removed the nodules from claimant’s elbows. Dr. Bhatti recommended that claimant undergo a bilateral CTS release for her “[bjilateral moderate to severe median nerve compression.” Claimant confirmed that Dr. Bhatti told her in December of 1999 that she had bilateral CTS which was worse on the left.
In early 2000, claimant saw Dr. Robert Evans, an osteopath, for continuing complaints of pain in her hands. He noted she had CTS and was waiting until school was out to have decompression surgery. In his February 26, 2000 office note, Dr. Evans noted “[m]ost of the problem comes during the day while she is working.... [S]he has to use the hands and wrists a big deal at work and it is mostly during this time and shortly afterwards that it bothers her.” When Dr. Evans saw claimant again on April 24, 2000, for “worsening pain,” he *258 noted she was a cafeteria worker and said, “I know that the repetitive nature of the work that she does, and has for years, is being the deciding factor in these bilateral carpal tunnel syndromes.”
Claimant subsequently returned to Dr. Faiz for the recommended CTS surgery. However, Dr. Faiz sent claimant back to Dr. Bhatti for repeat nerve conduction studies because the last studies had been performed during the previous year. The repeat nerve conduction studies revealed “normal ulnar nerve parameters bilaterally” but showed a mild worsening of claimant’s left CTS. Dr. Bhatti examined claimant again on November 16, 2000, and noted no significant changes in her CTS.
Claimant testified that she told Dr. Bhatti about the “repetitive lifting, rotating, bending[,] use of [her] wrist” and “pulling” she engaged in at work and that, sometime in the year 2000, Dr. Bhatti told her that her CTS “was caused by the work, by the lifting and the tugging all day long seven hours a day,” “[p]ulling all those years.” Dr. Bhatti’s office notes do not reflect this opinion or the communication of such an opinion to claimant. However, Dr. Bhatti opined in a November 22, 2000 letter to employer’s counsel that “[claimant’s] [CTS] is most probably secondary to [the] cumulative effect of several years duration involving repetitive lifting, rotating, bending, and use of wrists, regardless of weight, which may be caused by work done as is required by a cook.” He also noted that “frequent breaks between [claimant’s] cooking chores were observed [to] alleviate[ ][her] symptoms.” Finally, Dr. Bhatti indicated an awareness of the knots in claimant’s arms but opined the knots “most probably have no direct bearing on [her][CTS] symptoms unless upon surgical exploration they are found to be in the carpal tunnel region.”
The deputy commissioner expressed doubts about the sufficiency of the medical evidence, standing alone, to prove causation by clear and convincing evidence. However, he found that the record as a whole, including evidence of the repetitive nature of claimant’s job and the absence of evidence of any *259 non-work-related cause for claimant’s CTS, permitted him to find clear and convincing evidence of causation.
With one commissioner dissenting, the commission affirmed, noting that the evidence need not prove “conclusively]” that claimant’s CTS resulted from her work. The majority relied on (1) evidence that claimant’s job required “extensive” repetitive use of her hands and that claimant’s treating physicians offered uncontradicted testimony linking her work with her CTS and (2) a lack of evidence to suggest that any non-work-related activities could have caused claimant’s condition.
II.
ANALYSIS.
The Workers’ Compensation Act (the Act) provides that carpal tunnel syndrome is an “ordinary disease[ ] of life as defined in [Code] § 65.2-401.” Code § 65.2-400(C). For an ordinary disease of life to be compensable under Code § 65.2-401, a claimant must prove by “clear and convincing evidence, (not a mere probability),” that the disease (1) “arose out of and in the course of [her] employment as provided in Code § 65.2-400 ... ”; (2) “did not result from causes outside of the employment”; and (3) “follows as an incident of occupational disease ... [;] is an infectious or contagious disease contracted in the course of [specified types of employment]; or ... is characteristic of the employment and was caused by conditions peculiar to such employment.” Code § 65.2-401. Code § 65.2-400(B) provides that a disease arises out of the employment “if there is[, inter alia,] ... [a] direct causal connection between the conditions under which work is performed and the occupational disease; ... [and][i]t can be fairly traced to the employment as the proximate cause .... ” (Emphases added).
Evidence is clear and convincing when it produces in the fact finder “ ‘a firm belief or conviction as to the allegations sought to be established. It is ... more than a mere preponderance, but not to the extent of such certainty as is *260 required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.’ ” Fred C. Walker Agency v. Lacas, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975) (quoting Cross v. Ledford, 161 Ohio St. 469, 120 N.E.2d 118, 123 (1954)).
The commission’s determination regarding causation is a finding of fact. Marcus v. Arlington County Bd. of Supervisors, 15 Va.App. 544, 551, 425 S.E.2d 525, 530 (1993). A finding of causation need not be based exclusively on medical evidence. Dollar Gen’l Store v. Cridlin, 22 Va.App. 171, 176, 468 S.E.2d 152, 154 (1996). “The testimony of a claimant may also be considered in determining causation, especially where the medical testimony is inconclusive.” Id.
“To appraise the true degree of indispensability which should be accorded medical testimony, it is first necessary to dispel the misconception that valid awards can stand only if accompanied by a definite medical diagnosis. True, in many instances it may be impossible to form a judgment on the relation of the employment to the injury [or disease] ... without analyzing in medical terms what the injury or disease is. But this is not invariably so. In appropriate circumstances, awards may be made when medical evidence on these matters is inconclusive, indecisive, fragmentary, inconsistent, or even nonexistent.”
Id. at 177, 468 S.E.2d at 154-55 (quoting 2B Arthur Larson, The Law of Workmen’s Compensation § 79.51(a) (1995) (citations omitted)). Similarly, where the diagnosis is clear but the medical evidence does not provide a sufficient causal link between the ailment and the employment, the commission may rely on the testimony of the claimant to establish this link. Id.
In determining whether credible evidence exists to support the commission’s findings of fact, “the appellate court does not retry the facts, reweigh ... the evidence, or make its own determination of the credibility of the witnesses.” Wagner Enters. v. Brooks, 12 Va.App. 890, 894, 407 S.E.2d 32, 35 (1991). Thus, unless we can say as a matter of law that *261 claimant failed to sustain her burden of proving causation, the commission’s findings are binding and conclusive upon us. Marcus, 15 Va.App. at 551, 425 S.E.2d at 530; Tomko v. Michael’s Plastering Co., 210 Va. 697, 699, 173 S.E.2d 833, 835 (1970).
Claimant produced clear and convincing evidence that her CTS (1) arose out of and in the course of her employment, (2) did not result from causes outside her employment, (3) was characteristic of her employment and (4) was caused by conditions peculiar to such employment. As the commission noted, the medical evidence did not conflict and uniformly connected claimant’s condition with her employment. As the deputy commissioner and commission found, claimant’s duties included “cooking, stocking, washing, mopping, shoveling coal, mowing grass, using a weed eater and managing the furnace.” These duties required claimant “to use her hands and wrists a [great] deal,” and claimant reported that “it is mostly during this time and shortly afterwards that [her wrists and hands] bother[] her.” The evidence also indicated that “frequent breaks between [claimant’s] cooking chores ... alleviate[d][her] symptoms.”
Credible evidence established that Dr. Evans and Dr. Bhatti were aware of claimant’s job duties and the effect these duties had on her symptoms. Based on this knowledge, Dr. Evans opined that “the repetitive nature of the work that [claimant] does, and has [done] for years, is being the deciding factor in these bilateral carpal tunnel syndromes.” (Emphasis added). As we previously have held, the requirement that a claimant establish the source of the disease means she must point “not to a single source [of the disease], to the complete exclusion of all other sources, but to the primary source .... ” Ross Labs. v. Barbour, 13 Va.App. 373, 377, 412 S.E.2d 205, 208 (1991); see Marcus, 15 Va.App. at 551, 425 S.E.2d at 530. Dr. Evans’ opinion that the repetitive nature of claimant’s work was “the deciding factor” in her development of CTS was accepted by the commission and, considered together with claimant’s testimony and the other evidence in the record, constitutes credi *262 ble evidence that claimant’s work was “the primary source” of her CTS.[1]
Dr. Bhatti’s opinion further supports the commission’s finding of causation. Dr. Bhatti did not render his opinion based on “a mere probability,” a standard rejected by the language of Code § 65.2-401. Rather, Dr. Bhatti opined that claimant’s CTS “is most probably secondary to [the] cumulative effect of several years duration involving repetitive lifting, rotating, bending, and use of wrists.” (Emphasis added). He acknowledged the knots on claimant’s arms but opined that they “most probably ha[d] no direct bearing on her [CTS] symptoms” unless shown to have infiltrated the carpal tunnel region. (Emphasis added).
Something that is merely “probable” has “more evidence for [it] than against [it].” Black’s Law Dictionary 1081 (5th ed.1979). Thus, probability may be equated with proof by a preponderance, see Slaughter v. Valleydale Packers, Inc., 198 *263 Va. 339, 345-46, 94 S.E.2d 260, 266 (1956), an evidentiary standard lower than the clear and convincing evidentiary standard required by Code § 65.2-401, see Lucas, 215 Va. at 540, 211 S.E.2d at 92. However, Dr. Bhatti’s addition of the word “most” to his opinion changed its meaning considerably. The adverb “most” means “[i]n or to the highest degree” and is “[u]sed with many adjectives and adverbs to form the superlative degree [as in] most honest [or] most impatiently.” The American Heritage Dictionary of the English Language 1178 (3d ed.1992).
Thus, the commission could reasonably conclude that Dr. Bhatti, by combining the adverbs “most” and “probably,” expressed his opinion regarding the cause of claimant’s CTS as “a firm belief or conviction,” the standard required to prove a proposition by clear and convincing evidence. See Lucas, 215 Va. at 540, 211 S.E.2d at 92 (quoting Cross, 120 N.E.2d at 123). Further, in light of the record as a whole, Dr. Bhatti’s statement that the repetitive motion and resulting CTS he described “may be caused by work done as is required by a cook” was not an equivocation and, therefore, did not diminish the weight the commission could give to Dr. Bhatti’s opinion. As the commission noted, the record reflected claimant’s testimony, which it found credible, that claimant’s job did, in fact, require such activities. Claimant also testified that she had informed Dr. Bhatti, in response to his inquiries, about the repetitive nature of her job duties.[2] Thus, the record as a whole, including claimant’s testimony and the opinions of Drs. Evans and Bhatti, contained credible evidence to support the commission’s finding, by clear and convincing evidence, that claimant’s CTS arose out of and in the course of her work for employer.
Finally, the record supports the commission’s conclusion that claimant met her burden of proving her CTS did not result from causes outside of the employment. The medical evidence outlined above provided clear and convincing evi *264 dence that claimant’s CTS resulted from repetitive motion rather than from the nodules on claimant’s arms or from any other medical condition, and claimant testified that she engaged in no hobbies or other activities outside her work which involved this type of motion. Although statements from claimant’s doctors that her CTS did not result from any causes outside of the employment may have strengthened claimant’s case, such statements were not critical to the commission’s determination in light of claimant’s own testimony. See Cridlin, 22 Va.App. at 176-77, 468 S.E.2d at 154-55; see also Island Creek Coal Co. v. Breeding, 6 Va.App. 1, 11-12, 365 S.E.2d 782, 788 (1988) (where physician could not state “ ‘to a reasonable medical certainty’ that [claimant’s] hearing loss was not caused by non-employment factors” but said “[claimant] did not give me a history of anything [outside of work] I might interpret as having caused it,” the commission “could and did draw the reasonable inference that [claimant’s] hearing loss was not caused by non-employment factors based on his negative history of noise exposure which would cause such a hearing loss and the nonexistence of genetic or biological factors”).
For these reasons, we hold the record as a whole contains credible evidence to support the commission’s conclusion that claimant proved the necessary causal connection between her CTS and her employment and that she did so by clear and convincing evidence. Therefore, we affirm the commission’s award.

Affirmed.

. The dissent appears to construe Dr. Evans' opinion as stating that the nature of claimant’s work was merely a factor which contributed to her development of CTS. On the contrary, Dr. Evans expressly opined that claimant’s work was "the deciding factor.” (Emphasis added). Giving these words their ordinary import compels the conclusion, as set out in the text, that claimant’s work was “the primary source” of her CTS, which is all that the law requires. See Marcus, 15 Va.App. at 551, 425 S.E.2d at 530; Barbour, 13.Va.App. at 377, 412 S.E.2d at 208.
Webster's Third New International Dictionary 585 (1993), the source cited by the dissent, defines the word, "decide,” as follows;
vi; to dispel doubt on: a: to arrive at a choice or solution concerning which ends uncertainty or contention c'what to order for breakfast> b: to bring definitively and conclusively to an end esp. in matters relating to war <the victory at San Jacinto decided the war> ... vi: to make a choice or decision esp. a binding or definitive one presumably after consideration....
Under any of the above-quoted definitions of "decide,” "the deciding factor” is one which does more than simply contribute; under the second definition above, "the deciding factor” is the "definitive” or "conclusive” factor, rather than merely "one possible consideration.” Thus, viewing the evidence in the light most favorable to claimant, Dr. Evans’ opinion that claimant’s work was "the deciding factor” in her development of bilateral CTS is sufficient to support the commission’s implicit finding that it was "the primary source.” See Marcus, 15 Va.App. at 551, 425 S.E.2d at 530; Barbour, 13 Va.App. at 377, 412 S.E.2d at 208.

. In affirming the commission’s award, we do not rely on claimant’s hearsay testimony that Dr. Bhatti said her CTS was caused by her work.